COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Malveaux, Fulton and White
Argued at Fredericksburg, Virginia


THE TEMPLE FOUNDATION, INC.

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0518-22-4        JUDGE KIMBERLEY SLAYTON WHITE
                                                           MARCH 7, 2023

FOCUS SH ACQUISITIONS, LLC


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

Jason C. Greaves (Jesse R. Binnall; Binnall Law Group, on briefs),
for appellant.

Michael K. Kim (William B. Porter; Aneta Nikolic; Blankingship &
Keith, P.C., on brief), for appellee.


Appellant, The Temple Foundation, Inc., challenges the circuit court's granting of a

demurrer without leave to amend. After a careful review of the record, we affirm.

BACKGROUND

"Because the circuit court decided this case on demurrer[], we recite properly pled facts

as alleged in the amended complaint." *Steward ex rel. Steward v. Holland Fam. Properties,*

*LLC*, 284 Va. 282, 285 (2012) (quoting *Yuzefovsky v. St. John's Wood Apts.*, 261 Va. 97, 102

(2001)).

The Temple Foundation, Inc. ("Temple") is a Virginia non-profit corporation. Temple

operated The Virginian, a senior living center in Fairfax, Virginia, pursuant to a leasing

arrangement with the property owner, Thompson Associates ("Thompson"). In 2018, Focus SH

Acquisitions, LLC ("Focus") agreed to buy The Virginian from Thompson. Temple agreed to

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

transfer certain assets to Focus SH Acquisitions, LLC ("Focus") in addition to terminating their ground lease with Thompson.  In order to facilitate an orderly transition of operations of The Virginian from Temple to Focus, both parties entered into an operations transfer agreement ("OTA") with Thompson on November 13, 2018.  In addition to providing for the transfer and assumption of residential agreements, equipment leases and vendor contracts, and Medicare and Medicaid licenses, the OTA also provided that Temple "shall retain all rights in and title to all pre-closing accounts receivable except to the extent any portion relates in part to dates after the Closing Date."  The closing occurred on April 25, 2019.

Barbara Grant, a short-term physical therapy and rehabilitation patient of The Virginian in 2014, executed a trust on October 31, 2014.  The trust stated, in relevant part, that the trustee was to distribute "twenty-five percent (25%) of the trust fund to The Virginian, a Senior Living Center in Fairfax, Virginia.  If The Virginian is no longer in existence, this bequest shall lapse, and shall be distributed *pro rata* among my remaining beneficiaries."  Ms. Grant died on November 4, 2017.  On November 25, 2017, the trustee informed Temple, doing business as The Virginian, that it was the recipient of the bequest.

Although the bequest vested immediately, distributions did not occur until March and April 2019.  The second distribution, in the amount of $163,016.30, was received and deposited by Temple[1] after closing had occurred on April 25, 2019.  Pursuant to the OTA, following closing, the parties were to reconcile any outstanding accounts and fees.

Focus submitted its final reconciliation to Temple on February 25, 2020.  According to Focus, it owed Temple $6,596.20.  Temple, however, determined that it was owed $281,084.38.  If the parties could not come to an agreement during this reconciliation process, the OTA

---

[1] It is unclear from the record how Temple accessed the distributed funds after closing occurred on April 25, 2019.

provided that an agreed upon third-party accounting service would be employed to resolve the dispute. The OTA also provided that the decision by the accounting service "shall be binding" on the parties. Focus selected Ernst & Young, an accounting firm, and Temple agreed to the selection.

Following review of both parties' claims and documentation, Ernst & Young delivered the first draft of its final reconciliation on August 21, 2020. This first draft did not include the disputed funds from the bequest. The first draft required Focus to pay Temple $259,057. Following discussions with Focus, Ernst & Young revised its final reconciliation and delivered a new report on September 1, 2020, that included the disputed funds. Ernst & Young determined that the disputed funds were owed to Focus and, as such, concluded that Focus owed Temple $96,000.

Temple, disagreeing with Ernst & Young's conclusions, filed a complaint in the circuit court of Fairfax County on November 12, 2020, alleging breach of contract, unjust enrichment, and seeking declaratory judgment against Focus.[2] Attached to the complaint were several exhibits including, *inter alia*, the OTA, the Grant bequest, proration provisions, and the statement of work from Ernst & Young. By agreement, the deadline to answer was extended to January 6, 2021. On January 6, 2021, Focus filed a plea in bar and demurrer to the breach of contract and unjust enrichment claims as well as to Temple's motion for declaratory judgment against Focus. In the plea in bar, Focus pled:

> (a) that [Temple] was not "The Virginian" at the time of the
> payment of the Disputed Funds and therefore has no standing, right
> or interest to make a claim on the Disputed Funds; and/or (b) the
> claims in the Complaint are subject to an Alternate Dispute

---

[2] In addition, Temple claimed breach of contract, professional negligence, and sought declaratory judgment against Ernst & Young; however, pursuant to an order dated February 26, 2021, all claims against Ernst & Young were stayed pending resolution by mediation and/or arbitration.

Resolution ("ADR") provision and therefore is not properly before this Court.

On April 23, 2021, a hearing was held on Focus' demurrer and plea in bar. Upon consideration of briefs and the arguments of counsel, the circuit court sustained Focus' demurrer on all three counts without leave to amend and ordered Focus be dismissed as a defendant. Because the hearing took place via Webex, the circuit court allowed Temple ten days to file objections to the April 23, 2021 order. Temple filed their written objections on April 29, 2021. Additionally, on May 4, 2021, Temple filed a motion for reconsideration for leave to amend the complaint with a proposed, amended complaint attached as an exhibit. On May 6, 2021, the circuit court denied Temple's motion to reconsider because their motion had not "raised any issues such that this Court should modify the ruling."

On February 25, 2022, Temple moved to nonsuit the remaining claims against Ernst & Young. A hearing was held on March 4, 2022, and Temple's motion for nonsuit was granted thereby rendering the previous April 23, 2021 order a final order. Temple filed an appeal on March 29, 2022.

## ANALYSIS

On appeal, Temple's first assignment of error is that the circuit court erroneously interpreted the OTA when it found that: (A) Temple was a mere "manager" of The Virginian; and (B) the Grant bequest was subject to the proration and reconciliation provisions in § 11 and Exhibit F of the OTA. Temple's second assignment of error is that the circuit court, pursuant to its incorrect interpretation of the OTA, improperly sustained demurrer, without leave to amend, as to the breach of contract, unjust enrichment, and declaratory judgment claims.

### I. Interpretation of the OTA

We begin with Temple's assertion that the circuit court confused the nature of the relationship between the parties and impermissibly expanded the scope of the reconciliation

- 4 -

provisions of the OTA.  According to Temple, the circuit court "fundamentally misinterpreted the OTA" and that this "fundamental misunderstanding and misapplication of the OTA tainted all the [circuit] court's analysis."  After careful review of the unambiguous language in the OTA, we disagree.

"Interpretation of a contract is a question of law that is reviewed de novo." *Palmer & Palmer Co., LLC v. Waterfront Marine Const., Inc.*, 276 Va. 285, 289 (2008); s*ee also PMA Capitol Ins. Co. v. U.S. Airways, Inc.*, 271 Va. 352, 357-58 (2006).  "When a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." *Palmer & Palmer Co.*, 276 Va. at 289.  *See also Winn v. Aleda Constr. Co.*, 227 Va. 304, 307 (1984).  "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Palmer & Palmer Co.*, 276 Va. at 289 (quoting *W.F. Magann Corp. v. Virginia-Carolina Elec. Works, Inc.*, 203 Va. 259, 264 (1962)).  "On appeal, this Court is not bound by the trial court's determinations regarding the interpretation of an unambiguous contract." *Id.  See also Gordonsville Energy, L.P. v. Virginia Elec. & Power Co.*, 257 Va. 344, 353 (1999).

A.  Ownership of The Virginian

Temple claims that the circuit court erred by failing to look at the entirety of the OTA, as opposed to the information in the recitals section, to determine that Temple, rather than Thompson, was the owner of The Virginian.  Temple blames the circuit court's confusion on "inartfully drafted" recitals and assures this Court that, when read as a whole, the OTA "unambiguously" supports the conclusion that Temple is the owner.

The OTA, in the beginning of the recitals section, expressly provides that "Thompson Associates, a Virginia partnership ('Seller') is the owner of the independent living, assisted

living, memory care, and skilled nursing community known as 'The Virginian.'" Focus is referred to as "Purchaser" and Temple, referred to by Temple, is acknowledged as the lessor of The Virginian. The attached Exhibits C, D, G, H, F, and J all contain the same language, describing Thompson as the owner of The Virginian and designating it as the "Seller," as found in the recitals section. Each of these exhibits also acknowledges that Temple's interest in the property is as a lessor pursuant to a series of lease agreements between Temple and Thompson spanning almost four decades.

When the language in a contract is unambiguous, we are bound to accept what the contract plainly declares as the parties' intended meaning and must interpret it as written. *See Palmer & Palmer Co.*, 276 Va. at 289. The OTA, and the exhibits attached thereto, unambiguously define Thompson as the owner of The Virginian; Thompson is referred to as "the Seller" and Temple as "Temple" throughout; and Temple's relationship to The Virginian is described as that of a "lessor." A plain reading of the OTA and the attached exhibits makes clear that Thompson, not Temple, was the owner of The Virginian. Contrary to Temple's argument about the "inartfully drafted" recitals, these additional provisions and attached exhibits support the accuracy of the circuit court's conclusion that Thompson was the owner of The Virginian.

Given the overwhelming, express language throughout the OTA and the exhibits, this Court finds that Thompson, not Temple, was the owner of The Virginian prior to April 25, 2019. As such, we determined that the circuit court did not err when it held Temple was merely a "manager" of The Virginian.

### B. Scope of the Reconciliation

Another error, Temple argues, was the circuit court's improper expansion of the scope of the reconciliation provisions to include the Grant bequest. In addition, Temple asserts that their disagreement is not controlled by the dispute resolution clause. Temple claims that "the trial

court created an absurd result" allowing Ernst & Young to determine the fate of the disputed funds pursuant to § 11 of the OTA rather than assume the power to do so itself. According to Temple, the circuit court's "plainly absurd reading of the contract" abdicated its responsibility to interpret and enforce the terms of the OTA—namely, that the bequest fell outside the scope of the reconciliation and dispute resolution provisions—and improperly reduced Temple's argument to a collateral attack on the reconciliation.

We begin with § 11 of the OTA which states:

> Temple shall prorate the applicable items of income and expense directly with Purchaser and shall provide and receive credits to and from Purchaser, as applicable, in accordance with the Purchase Agreement excerpts attached hereto as Exhibit F (the "Proration Provisions"). In addition to the closing prorations, this Section 11 shall apply to any rents or other amounts received by any party after the Closing Date and any reproration obligations pursuant to the Proration Provisions.

Next, Exhibit F, incorporated in its entirety by § 11 into the OTA, begins by stating that "Temple shall comply with all obligations of 'Seller' and 'Temple' as set forth in the language below." Section 10.5 of Exhibit F states, in relevant part, that "[a] final reconciliation of all expenses, costs, charges, service fees and resident rents shall be prepared by Purchaser and delivered to Seller." Furthermore, "[a]fter approval of the Final Reconciliation by both parties, the party determined to owe cash as a result of such Final Reconciliation shall promptly pay such cash to the other party." If, however, "Purchaser and Seller cannot agree upon a Final Reconciliation, then the determination of a Final Reconciliation shall be made by an independent CPA firm mutually selected by Purchaser and Seller, whose determination shall be binding upon Purchaser and Seller."

Once again, we are bound to interpret the express terms of the contract as they are written and accept that the parties intended what the contract language plainly declares. *See Palmer & Palmer Co.*, 276 Va. at 289. First, § 11 of the OTA begins by unambiguously incorporating

Exhibit F, labeled the "Proration Provisions." In doing so, the OTA clearly incorporates § 10.5 of Exhibit F wherein, should Temple and Focus fail to reconcile their respective prorations, a mutually selected, independent CPA firm would resolve the dispute. This reconciliation, per § 10.5 of Exhibit F, would include "all expenses, costs, charges, service fees and resident rents." Section 11 goes on to state that "[i]n addition to the closing prorations, this Section 11 shall apply to any rents or other amounts received by any party after the Closing Date and any reproration obligations pursuant to the Proration Provisions." Such unambiguous use of inclusive language, such as "in addition to" and "any rents or other amounts received by any party," represents the parties' intent to broaden the scope of the reconciliation process beyond the terms outlined in § 10.5 of Exhibit F.

Rather than a "plainly absurd reading of the contract," the circuit court applied the unambiguous, express meaning of the OTA's provisions. The circuit court correctly found that the OTA's reconciliation process, in addition to the provisions outlined under § 10.5 of Exhibit F, applied to any other amounts received by any party. The circuit court never broadened the scope of § 10.5—the parties themselves did so when they modified § 10.5 with the inclusive language in § 11. As such, we hold the circuit court's determination that the Grant bequest fell within the scope of the reconciliation process was not error.

## II. Demurrer

Next, Temple argues that the circuit court erred when it sustained demurrers as to Temple's breach of contract, unjust enrichment, and declaratory judgment claims without leave to amend. For the following reasons, we disagree.

"This Court reviews the sustaining of a demurrer de novo." *Padula-Wilson v. Landry*, 298 Va. 565, 574 (2020). Furthermore, "[i]n reviewing a circuit court's decision to grant a demurrer, 'we accept as true all properly pled facts and all inferences fairly drawn from those

facts.'" *Id.* (quoting *Augusta Mut. Ins. Co. v. Mason*, 274 Va. 199, 204 (2007)). The question to us is the same as it is to the circuit court: "whether the facts alleged in a complaint are legally sufficient to state a cause of action upon which the requested relief may be granted." *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 322 (2015). *See also Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 143 (2013). However, "a court considering a demurrer may ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings." *Ward's Equipment, Inc. v. New Holland North America, Inc.*, 254 Va. 379, 382 (1997).

### A. Breach of Contract & Covenant of Good Faith and Fair Dealing

Temple argues that Focus breached the contract[3] when Focus invoked the reconciliation provisions of § 10.5 in Exhibit F and convinced Ernst & Young that, per § 11 of the OTA, the disputed funds were included in the reconciliation process. As such, Temple argues, it was error for the circuit court to conclude, "without analysis and in derogation of its judicial role," that the disputed funds were properly subject to the final reconciliation.

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos*, 289 Va. at 323. "In a breach of contract claim, the parties' contract becomes the law governing the case unless it is repugnant to some rule of law or public policy." *Palmer & Palmer Co.*, 276 Va. at 289.

Here, Temple has only pled that Focus breached the OTA, by invoking the reconciliation provisions within, because Focus induced Ernst & Young to consider payments outside the scope of the reconciliation process. As discussed above, Temple's interpretation of the contract is in

---

[3] Temple also argues that Focus, through their contractual breach, intrinsically breached the covenant of good faith and fair dealing. Given that we find no breach of contract, we decline to address their covenant of good faith and fair dealing argument.

direct contradiction to the plain language of both the OTA and the exhibits. In other words, Temple has pled that Focus has breached their contract by invoking their rights under the unambiguous terms of said contract. Even accepting as true all of Temple's properly pled facts, Temple's complaint cannot sufficiently state a cause of action for breach of contract, particularly, when placed alongside the plain language of the OTA. *See Ramos*, 289 Va. at 322-23. *See also Ward's Equipment, Inc.*, 254 Va. at 382.

Rather than reveal a conspiracy between Focus and Ernst & Young to deprive Temple of the disputed funds, Temple has pled that Focus properly adhered to the reconciliation provisions of the OTA for which there is no legal remedy. As such, we hold that the trial court did not err when it sustained Focus' demurrer as to Temple's breach of contract claim.

### B. Unjust Enrichment

Temple next argues that the circuit court erred when it sustained the demurrer as to Temple's unjust enrichment claim. According to Temple, Focus unjustly enriched itself at Temple's expense when it retained the benefit of the Grant bequest. Primarily, Temple relies on the fact that it had retained the first distribution of the Grant bequest to The Virginian prior to the closing on April 25, 2019. As such, Temple argues, the second distribution rightfully belonged to Temple had Focus not unjustly retained it.

The elements of unjust enrichment are "(1) '[plaintiff] conferred a benefit on [defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value.'" *T. Musgrove Constr. Co. v. Young*, 298 Va. 480, 486 (2020) (alterations in original) (quoting *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (2008)).

Here, Temple has failed to plead facts alleging Focus retained a benefit from Temple without paying for its value. As with their breach of contract claim, Temple's claim of unjust

- 10 -

enrichment erroneously relies on their misinterpretation of the OTA and the Grant bequest. When the second distribution occurred after closing on April 25, 2019, Temple, somehow, retained the disputed funds despite the Grant bequest explicitly leaving the money to "The Virginian, a Senior Living Center in Fairfax, Virginia." As discussed above, per the unambiguous meaning of the OTA and all exhibits attached thereto, Thompson, not Temple, was the owner of The Virginian. Moreover, regardless of the status of ownership of The Virginian between Temple and Thompson, as of April 25, 2019, Focus was the rightful owner of The Virginian when the second distribution of the disputed funds occurred. In other words, Temple had no right to the second distribution and, by keeping the money, conferred no benefit onto Focus.

Rather than unjustly enrich themselves at Temple's expense, Focus properly sought to make themselves whole through the reconciliation process provided in the OTA. As such, on these facts, there are no circumstances in which Focus could have unjustly enriched themselves at Temple's expense. Therefore, we hold the circuit court did not err sustaining Focus' demurrer as to the unjust enrichment claim without leave to amend.

## C. Declaratory Judgment

Temple argues that the circuit court erred when it sustained the demurrer as to their declaratory judgment action. Specifically, Temple states that the circuit court incorrectly concluded there was no judiciable controversy and "improperly delegated its judicial role" to Ernst & Young.

Code § 8.01-191 states:

> This article is declared to be remedial. Its purpose is to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights asserted by the other as to entitle him to maintain an ordinary action therefor. It is to be liberally

interpreted and administered with a view to making the courts
more serviceable to the people.

"The purpose of a declaratory judgment proceeding is the adjudication of rights; an actual controversy is a prerequisite to a court having authority." *Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Sup'rs*, 285 Va. 87, 98 (2013). Without an "actual controversy between the parties regarding the adjudication of rights, the declaratory judgment is an advisory opinion that the court does not have jurisdiction to render." *Id.* "The General Assembly created the power to issue declaratory judgments to resolve disputes 'before the right is violated.'" *Id.* "The declaratory judgment acts do not create or change any substantive rights, or bring into being or modify any relationships, or alter the character of controversies, which are the subject of judicial power." *Id.* at 99.

"'Preventive relief is the moving purpose.' The object of the declaratory judgment action must be the adjudication of rights." *Id.* (citation omitted) Therefore, if the "'actual objective in the declaratory judgment proceeding [is] a determination of [a] disputed issue rather than an adjudication of the parties' rights,' the case is not one for declaratory judgment." *Id.* (alterations in original) (citation omitted). Finally, "where claims and rights asserted have fully matured, and the alleged wrongs have already been suffered, a declaratory judgment proceeding, which is intended to permit the declaration of rights before they mature, is not an available remedy." *Id.*

Here, Temple seeks to have the reconciliation process conducted by Ernst & Young undone by the circuit court. In other words, the wrongs Temple asserts it wishes to avoid have already been suffered. As such, there is no declaration of rights that can provide Temple with any meaningful relief—rather, the circuit court would be rendering an advisory opinion on rights that have fully matured. *See id.* at 98-99. "[W]here . . . the alleged wrongs have already been suffered, a declaratory judgment proceeding . . . is not an available remedy." *Id.* at 99.

Temple's assertion that the circuit court erred when it sustained Focus' demurrer as to the declaratory judgment claim is without merit. By its very nature, declaratory judgment was unavailable to Temple after suffering the alleged harms through the final reconciliation by Ernst & Young. Under no set of facts could Temple have petitioned the court for declaratory judgment regarding the scope of the reconciliation provisions of the OTA after the final reconciliation occurred. As such, it was not error for the circuit court to sustain Focus' demurrer without leave to amend as to Temple's declaratory judgment claim.

### D. Leave to Amend

Lastly, Temple argues that the circuit court erred when it denied Temple the opportunity to amend their complaint after sustaining demurrer. Temple asserts that the circuit court "compounded its error" by denying Temple an opportunity to amend thereby "short-circuiting" the litigation process.

"No amendments may be made to any pleading after it is filed save by leave of court. Leave to amend should be liberally granted in furtherance of the ends of justice." Rule 1:8. Even so, "[t]he decision whether to grant leave to amend a complaint rests within the sound discretion of the trial court." *Doe by & Through Doe v. Baker*, 299 Va. 628, 656 (2021) (quoting *Kimble v. Carey*, 279 Va. 652, 662 (2010)). Therefore, we will not disturb the circuit court's ruling "absent a showing of abuse of discretion." *Adkins v. Dixon*, 253 Va. 275, 279 (1997).

Here, Temple has failed to show the circuit court abused its discretion. At the time the circuit court sustained demurrer, it had considered Temple's entire complaint—including all the relevant documents attached as exhibits, including the actual OTA, the reconciliation provisions, and the scope of work agreement provided by Ernst & Young. In other words, the circuit court had access to the full, relevant documentation necessary to make its decision to deny the request for leave to amend at the time it sustained demurrer with prejudice. Moreover, Temple had the

opportunity to convince the circuit court otherwise upon its motion for reconsideration of the request for leave to amend where Temple attached an amended copy of their complaint. The circuit court specifically found that, even with the amendments, the amended complaint failed to raise any issue that would compel reconsideration of the demurrer.

Given that amendment of a pleading is within the sound discretion of the trial court and that, here, the circuit court had access to all the relevant documentation underlying the controversy between the parties, we find that it was not an abuse of discretion for the circuit court to deny Temple their requested leave to amend their complaint. As such, we hold that the circuit court did not err when it sustained demurrer with prejudice and subsequently denied Temple's motion for reconsideration for leave to amend.

## CONCLUSION

Temple's assertions that the circuit court misinterpreted the OTA are without merit. Pursuant to the plain and unambiguous language found throughout the OTA and the attached exhibits, Temple was neither the owner of The Virginian nor did the disputed funds fall outside the scope of the reconciliation provisions. Furthermore, the circuit court did not err when it sustained the demurrer without leave to amend as to Temple's breach of contract, unjust enrichment, and declaratory judgment claims because Temple's complaint was legally insufficient to state a cause of action upon which relief could be granted.

*Affirmed*.